Our first case for argument this morning is the United States v. Coley and Duggar. Ms. Eisenman. May it please the Court, Vanessa Eisenman for David Duggar. The primary issue affecting Mr. Duggar is whether there was sufficient evidence to convict him of drug conspiracy. There was not. The government did not prove beyond a reasonable doubt that Duggar and Betz had anything other than a buyer-seller relationship. This Court has talked about two primary principles of drug conspiracy, being some sort of interested cooperation or a stake in the venture, like the two co-conspirators are working together, and some sort of an agreement to advance future sales. Betz's testimony confirmed that neither of those two principles were present here. As Betz testified, these two men had a truly arm's-length relationship. Very importantly, Duggar paid cash every single time up front for the drugs that he bought from Betz, every time. And this was not a coincidence. Betz testified that he never fronted drugs to Duggar because he didn't trust him. He didn't know whether he would pay him back, so that's why he always asked for the cash up front. The two men also did not share any sort of information. Betz didn't know who Duggar's customers were. Duggar didn't know who Betz's suppliers were. Betz never gave Duggar any sort of direction about what to do with the drugs once he sold them. There was no sort of, you know, he's working for me, I'm giving him directions, I'm kind of telling him what to do. They would haggle over the price every single time. There was no set price. And Betz knew that Duggar had another supplier, and so Duggar would use information from his other supplier to kind of get the price, to try to negotiate the price with Betz every time. Didn't Betz say, though, that he had his doubts about whether or not Duggar actually had another supplier? Yes, but there were text messages that confirmed that that's what Duggar told Betz, is that I have a main guy. And then he also said on cross-examination that he wouldn't have known or cared if there was another supplier. But given that testimony, wouldn't the jury be able to find that, wouldn't they be able to basically believe Betz that Duggar didn't have another supplier? Sure. Because you are here on a sufficiency of evidence standard, right? And that's fine, but this is a totality of the circumstances analysis, and not having another supplier, that's not like a but-for regarding drug conspiracy. That would be just one factor. And even if this was an exclusive agreement, like what Betz testified to, right, when the government asked about what's your agreement, he says basically we were exclusive. I agreed to have drugs for Duggar, and Duggar agreed to buy drugs for me. Even if that were true, so assuming that the jury believed, Betz, that he said he didn't really have another supplier, exclusivity is not the same thing as drug conspiracy. It's not the same thing as having a joint agreement to further distribute drugs to others. That would just be, hey, I go to Walgreens for my prescriptions every single time, and Walgreens knows that I come there every single time, and I agree to keep coming back because I get such great service from Walgreens. Except that's a legal transaction. Yeah. You're right. You're right. You're right. But we're not disputing that there was any drug distribution here. That's not in dispute. And that wasn't disputed at trial. The whole issue at trial was whether this was sufficient to see that this was anything more than a buyer-seller relationship. There was not a dispute. There was tons of evidence of drug dealing, and I'm not here to argue any of that. Distribution quantities. Yes. Repeated transactions. Yes. Over a course of time. Yes. And this court has said that those things standing on their own is not enough to show beyond a reasonable doubt that there was a drug conspiracy. This court has said there has to be something more than multiple transactions. What about the other things the government does at least mention in its brief? There was advice given, things of that nature. Apparently, Duggar asked for help at one point with respect to some difficult customers. He was counseled, or at least he was told by this guy, Bates, about police presence, we're told, on one occasion. What about all these things? Do they at least cumulatively make for the case? No. This was, like, all in April. This was, like, one month, and a couple of those were even part of the same chain of text messages. Basically, what was happening is Bates saw some, I think, police presence at a hotel. Mr. Reitz can correct me if I'm wrong on these facts, but basically he said, you know, there's police around. Don't go here anymore. Okay. That's as much self-preservation as it is, you know, trying to warn somebody or trying to help somebody with their business. Another time, he said, stop showing up late. This is bad business. What he meant was he doesn't want to be him or his guys sitting around waiting with a bunch of drugs in a hotel parking lot or something like that. Stop showing up late. He even charges him more. But it doesn't show that Bates thought your client was one of his guys. No. He said he was one of his customers, and he didn't want to get caught in the parking lot just hanging out for an hour because Duggar was late. And then the thing about asking for help, this was, again, one conversation, and I think it was joined with one of those other really little snippets. And he says, yeah, I've got these guys that are screaming my name, my government name or something like that. And he says, you told me that if I ever had a problem with anybody, you know, just give them your names. And he's like, yep, I got your back. Bates testified that even at the time he says this, he had no intention of helping anybody. Tell me, Counselor Ed, with respect to our articulation of the law of conspiracy, do you see any particular ambiguities that you think we need to clarify? No. I like our jury instruction. I actually think it's really good. I think ours, it really gives, like, two main things, right? Even if the seller knows that the buyer is going to resell, that's not enough for a conspiracy. That's way back in direct sales, U.S. Supreme Court case. That's really clear. And that's something that's confusing to the jury, right? They think, oh, he knows he's going to go and sell these drugs. That must mean they're working together. No, it's not. That's not enough to show that they had a joint criminal objective of further distributing drugs to others and of working together. And then that's kind of the second part of the jury instruction, the joint criminal objective of further distributing drugs to others. Again, in this sort of, like, hierarchy, what the jury needed to find is that Duggar was working essentially for vets, and that's not shown here at all. He's not giving them any sort of direction. He's – oh, I'm sorry. I'm over time. Thank you. I would ask that you reverse the conviction. Thank you. Mr. Kelleher. Good morning, Your Honors. Christopher Kelleher for the appellant, Rick Coley. As this court knows, the concept of constructive possession is a legal fiction. And this case tests how far into the realm of make-believe we should go. Rick Coley was found to possess a gun which no one ever saw him with. No phone or text evidence ever tied him to this gun. No witness testimony tied him to this gun. He never admitted the gun was his, never acknowledged its existence. So against this barren backdrop, what do we have? We have a shotgun propped in the entryway of a room. The door was open. Obviously, the room was unlocked. There's evidence to suggest that Mr. Coley was sleeping in this room with someone else. Additionally, there were five other people in this home. Now, this home was not your standard house. It was more of a flop house. There were three rooms in the home. It was a small home. And the room that Mr. Coley was sleeping in was on the first floor. In addition, unlike virtually every other constructive possession case, Mr. Coley's belongings were not scattered in this room. There was no evidence that this was a regular place that he stayed at. As the record demonstrated, Mr. Coley was a man of no fixed abode. The gun itself, again, was in the entryway of the door. Most of these other constructive possession cases, as we made clear in the briefs, involve a situation where the gun is buried in a closet, put under a bed, hidden somewhere. That is not this case. And the fact, another distinguishing fact. Why would that be important that the weapon was hidden? I mean, in a way, the fact that it was his room and the gun's out in the open right there seems to be a better case for the government. Well, Judge Ripple, I respectfully disagree because that gun, we don't know when it was put there. It literally could have been put there as SWAT was surrounding the house saying, come out, and someone could have literally just placed it right there as they're walking out to basically absolve themselves or to frame Mr. Coley. Did your client ever admit he had a firearm? He did not. At no time? He did not. There was a text from 18 months prior to the arrest in which he said to another co-defendant, it's good to have a pole. It's good to have a gun. That's literally it. So the government is on very thin ice. And to reiterate the point about where the gun was, the reason I bring up in these other instances where the gun is hidden someplace, not only does it show that this gun was probably not accessible to other people, it was also likely that the dweller of that room, it was more likely theirs. So again, the fact that it was literally in the entryway of the door, any of these six people, including Mr. Coley, could have put it there. So in a lot of cases in which the court finds constructive possession, again, it's because of where the gun is. And it's, again, typically hidden someplace, which again would suggest that it's the room dweller. Isn't this a question of inference for the finder of fact, though, as to whether there were a sufficient integer of control by your client or not? Well, Your Honor, I would respectfully disagree because we need speculation. We need speculation that the gun was placed there by Mr. Coley. It was – he had placed it there that morning. He had control. So, I mean, it is to a degree a fact-laden question. Joint constructive possession is possible. Yes. So he does not need to be the one who placed it there. Constructive possession can be found, if a jury so finds, based on proximity plus dominion and control, ownership, et cetera, over the premises in question here, the bedroom. And there's no dispute this was his bedroom. And he, in fact, directed the police to that bedroom to go bring him some clothes from his closet. So it's clear that he had control over the bedroom. It was his bedroom. So it really doesn't matter if he placed the gun in the bedroom. Well, Judge Sykes, I disagree on – I would quibble with a couple points there. I agree, obviously, with the premise of joint and constructive possession. I recognize that. The issue here, though, I would submit is concerns the substantial connection. And what is the substantial connection between Mr. Coley and this firearm? And that's – we really don't have anything here. And unlike these other cases where, again, there was some evidence that this was this person's room, and I would respectfully disagree that this was his room in the sense that it was a place he was sleeping. And I'm not trying to mince words, but this was a place, certainly, he was sleeping. But this wasn't a situation where – and the reason I point this out is because the court has emphasized this. In other instances, there's prescription medicine with the defendant's name on it. There's pieces of mail. There's bills. There's paperwork with the defendant's name. He kept his clothes in the closet. He wasn't just an occasional overnight visitor. This is where he was living, and this was the bedroom that he was using. Your Honor, I know that there was a closet there, and I'm not 100% sure how much clothes was there. And, again, I'm not trying to circumvent the question. But, again, if there's a closet full of clothes, I still think we're on strong ground. We can prevail. But I don't think that's the case here. Again, given his penchant for moving around, again, this was not – I don't think it was a place that he was necessarily staying, living there. And, again, there was another individual. The record's not entirely clear, but there was another individual sleeping in that room. And then, again, you have four additional people in this small place and with the room on the first floor. So I would ask that the court consider the confluence of all these factors and all these facts that just simply aren't present in these other constructive possession cases. May I ask you the same question I asked your colleague? Sure. With respect to the law of conspiracy, do you think there are any ambiguities in our circuit's articulation of the law of conspiracy that really need to be corrected? I do not, Your Honor. And I would echo Ms. Eisenman. She's much more knowledgeable about this issue than I am. But based on my more limited knowledge, I would echo her position. Thank you. And I think it's fine. If there are no further questions. Thank you. Thank you, Your Honor. Mr. Reitz. May it please the Court. Brian Reitz for the United States. This Court has called it difficult in circumstantial evidence cases to distinguish between conspiratorial agreements and buyer-seller agreements. The record here, however, removes that difficulty because it includes direct evidence of an agreement. The conspiracy's local leader testified unequivocally that he had an agreement with both Mr. Duggar and Mr. Coley to sell drugs to them that depended on the further distribution of those drugs. The jury accepted that testimony. And the deferential standard of review to the jury compels this Court to affirm. Even if that was not... So you're relying on large quantities and repeated distribution, are you not? So as to Mr. Duggar's relationship with Betz, yes. All the other potential conspiracies have the three factors the Court has always said that... Is it true that we have said that's not enough? Yes, but the Court has also said it's indicative of a conspiracy. It's true that generally large-scale distribution, repeated distribution... See, this is why I've been asking your colleagues about our language and our opinions. Indicative of conspiracy, but it's not enough. So I was going to eventually reach your question, Judge Ripple, and I think my answer here is both yes and no. So we have litigated this case under the Court's current body of law. We think that's sufficient for the Court to affirm and for us to prevail here. Certainly, the Court recently held an en banc argument where the government addressed what I think, in our view, is inconsistencies in the law. I think the attorneys in that case put the government's position better than I can. But for the purpose of this case, we are operating under the law as it is. Of course, if the Court decides differently in Page, then that would apply. But we think we can prevail under the precedent at the time now, and we've not sought to change the law in this particular case. Again, you seem to rely very heavily on the exclusivity of Duger's arrangement with Betz. Am I right? Yes, correct. So we think... But we've said that's not enough either, right? Yeah, the Court has said a lot of things are not enough individually, but holistically, we think all of this goes into the same bucket. So the one thing the Court has been consistent on is that repeated distribution-level sales with fronting equals a conspiracy, or the jury can infer. That seems to be the bedrock. That's the one thing we certainly can say. So Coley has that with Betz. Coley has that with Smith and Pennington. Duger has that with Fielder. So all the convictions can be affirmed on that basis. It is true that Duger only has two of those three factors with Betz, though we think the exclusivity sort of stands in the place of the fronting because operationally it's similar. Using Betz and Coley and Betz and Duger. So Betz fronted the drugs to Coley, so he had an interest in Coley's redistribution because he stood to lose money if Coley didn't further redistribute those drugs. With Duger, he didn't stand to lose money, but he did stand to not earn any money if Duger didn't then redistribute drugs, make money, and then come back to buy more drugs. And the purpose of drug dealing is earning money. So I think really that ties their agreement downstream. The Court also – Judge Ripple, you also asked about the other factors, and I want to focus a little bit on Mr. Duger's request for protection. And if I may, I'm going to spin off Mr. Duger's point about Walgreens. So if I buy prescription drugs from Walgreens and then I sell those drugs and I have a problem with the customer, if I contact Walgreens, they're going to say, whoa, whoa, that's a crime and call the police. However, if Walgreens entertains that and then gives me advice, Walgreens is conspiring with me. So that in and of itself is the other factor beyond the large-scale and distribution-level quantities that goes to show that Mr. Duger and Mr. Betz were cooperating with each other. So Judge Ripple, I think, raises a really interesting point, which is this kind of thin line between conspiracy and transactions, right? And so particularly if you focus on large, regularly conducted transactions, if the seller in those transactions knows that the quantities he's selling is not for personal use, like the only real use has to be distribution, is that knowledge enough or does the seller need to want the distribution to happen? And if so, what are the indicia that would change it from knowledge to want? So I think the court has said the mere knowledge is insufficient. Now, I think in Page, the government maybe at least implicitly disputed that, but again, we're operating under that. The want is the need. So there is an interest. There has to be an interest in the further redistribution. I mean the court previously has said that. Other than just money, right? The knowledge could go to episodic transactions. So like if I sold someone drugs every six months and it's a lot, I would know that they were probably redistributing, but that may not be a conspiracy. But the repeated in large scale certainly ups it to a little more than knowledge. I mean maybe it doesn't get you all the way to want under the court's current precedence. So at least as of now, the government has to add something to that. I think we've added exclusivity. We've added the cooperation based on the request for protection, the police warning, and the other business advice. And I think I again have to step back and say that your honors question I think operates under the circumstantial evidence paradigm, and we have direct evidence here. So I don't know how the court could reverse when we have the leader of the conspiracy saying I have an agreement with Mr. Duggar so that he could sell these drugs for me and then we could both make money. That is an interest in the further redistribution of the drugs. If the court has no further questions on the conspiracy. In the ordinary case, the kingpin isn't a government witness. Correct. We got the kingpin here saying these are my guys. Yes, it is rare. I mean I have not seen this testimony before because it can only arise when it's the kingpin. Witnesses have to have direct knowledge, of course, and most of the time the cooperators are a little lower and they can't say they have that agreement. As it notes here, Mr. Fielder didn't say he had a formal agreement with Mr. Duggar even though the three factors were present and he was a conspirator. With that, I will just briefly move on to the drug count. I think that the conviction here is well within the court's precedence like Kitchen and Richardson. I don't really have much to say factually other than I think Mr. Coley, one, is second guessing the jury's verdict, and two, is trying to ignore the fact that joint constructive possession is possible. His arguments, I think, are strong for a jury. The jury could have accepted them. It wouldn't have surprised me if they did. But once the jury accepted our version of the events, the court can't reverse. And just before I sit down, I just want one point about the gun because the picture is not in the record. So if this is the door, the gun is right here, similar to where one might put an umbrella when they're getting ready to leave. So Judge Ripple's point, I think that is more compelling because if you were trying to protect yourself, I don't know if Mr. Coley was right-handed, but most people are right-handed. It's right there to grab as he's coming out the door. So the jury could have relied on that factor too, especially in couple with the drugs. Could I ask a question about the motion to sever? You may, Your Honor. We have said in our case law that you do have to establish a connection between the firearm and the drugs. And yet we also have case law that says there's a presumption with respect that there is a connection. I'm having difficulty reconciling those two lines of thought. It seems to depend on who writes the opinion. Can you reconcile those for me? Here is how I read them. I don't know if this is the Department's position. How I read them is there is the presumption, but if there's not something else, then maybe the presumption can be overridden. I agree. It's a subtle way of almost changing the burden, isn't it? The defendant's got to come up with something and say, oh, no, there's no connection between the two. Or perhaps the absence of something like Hubbard. I think Hubbard you could look at that perhaps the government does have to show a connection to withhold, to upstand the presumption. Where Hubbard, we couldn't do so because there's 17 months between the two. Please, I'm sorry. And here we were able to show it because one, the guns and drug paraphernalia were possessed at the same time, the day the conspiracy ended. And there was evidence that both Duggar and Coley had guns during the conspiracy. So Mr. Fielder testified that Duggar had guns with him during drug deals. And then Coley, I agree, was one reference, but he did reference having a pole for protection. He at least admitted that guns are part of this business.  Yes, so however one looks at the burden or the presumption versus a connection, we've cleared that. Well, I'm worried about our second obligation in these cases of clarifying law. And does the government really need a presumption here? I don't know if it's need. I think the presumption just flows from common sense. I think that's maybe why the court has said so. The court has consistently said that drugs and guns go together. So it's logical that in the mine run case they can be joined in an indictment. Call it a presumption, call it something else. I think that concern maybe is better. I don't think the court needs to change its case law. The concern when it arises may be better at the severance stage. You don't off the top of your head know. Do you happen to know whether other circuits use that language, presumption? I do not know, Your Honor. Sorry, I didn't ask. I'm really taking you off the farm a little bit, I understand. Yeah, I didn't research other circuits' cases. I think this court will. This court's precedents are at least clear as applied to this case. So I didn't really look beyond it. Does the presumption have anything to do with Rule 8 and the joinder rule? That is that counts, offenses, they're based on the same act or transaction, are presumptively joined under Rule 8? Yeah, I think the presumption is probably tied to Rule 8. Whether one looks at it that or the connection, I guess I think about it more of a connection. But that is tied to Rule 8 because if the court says, on one hand, that guns are tools of the drug trade, as it always has, and then we look at Rule 8 and it says are these offenses connected, it's not really very difficult to get from point A to point B on that. Call it a presumption, call it whatever. It is a logical, common-sense finding. The court has no further questions. We ask it to affirm. Thank you. Thank you. Ms. Eisenman, you had used all of your time, but I'll give you a little extra time if you have something else to say in rebuttal. Okay, I'll try to be really quick. Just in terms of the direct evidence, we made this point in our brief, but I just want to emphasize it. Please read exactly what Betz said the agreement was. He did not say that this is an agreement that we were going to be in business together selling drugs. He says this is an agreement that I'm going to have drugs that Duggar can buy from me, and as long as I have that, he doesn't have to work with anybody else. That is not drug conspiracy. That is an exclusive, at most, it's an exclusive buyer-seller relationship. What if it is combined with the frequent selling of a large quantity of drugs? No, not enough. Why not? Because it doesn't show that they're in business together. It doesn't show that they have any joint objective to kind of keep this thing going. It's done. He's paid them all the money that he owes them. That's what really distinguishes this case from so many others that this court sees. This is cash paid up front, and this is nothing about, you know, Duggar, go deliver some drugs to this guy. Go, you know, give half of them to this, half of them to that. He's not giving him any sort of directions as if he's one of his underlings working for him, and it's not on credit. This is transactions that are completed at the end. Betz says he doesn't know or care where he gets the money or what he does with the drugs. He could consume the whole thing. Now, this is user quantity. I know that there's knowledge, but knowledge is not enough, and he says that I didn't know or didn't care, and, of course, he didn't, because Duggar's coming to him with cash all the time. So I would just emphasize that this is not the kingpin saying Duggar is one of my guys. I told him what to do. He sold drugs. That is not what he testifies to, and that is not what the rest of the evidence shows. Thank you. Thank you. Mr. Kelleher, you had some rebuttal time. I think 15 seconds. Is that all it was? I'll give you a little extra time. I thought you had more than that. That's fine. That's fine. Thank you. Very briefly, obviously, ultimately the questions which the prosecution cannot answer, no one can answer, is how did that gun get there? Who put it there? When was it put there? And, again, you have six total people living in this small house, very different from these other constructive possession cases, and, again, the gun being at the doorway with due respect to Mr. Wright's, that shows anybody could have put it there. So, again, I recognize the high hurdle. You know, the Seventh Circuit seems to be the place where constructive possession cases go to die, but, again, what makes this case different is the number of people in this home, where the gun is located, and the lack of personal effects other than gunshot wounds, which, again, is a case that we can't close, personal effects that typically permeate these other cases and which heavily influence the court's decisions on these cases. So, again, we respectfully ask that the court reverse on this issue. Are there no further questions? Thank you very much. Our thanks to all counsel. The case is taken under advisement.